**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LETICIA COLON DE MEJIAS, | : | |
| ET. AL., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:18-CV-00817 (JCH) |
| v. | : | |
| | : | |
| DANNEL P. MALLOY, in his official | : | OCTOBER 25, 2018 |
| Capacity as Governor of the State | : | |
| of Connecticut, ET AL. | : | |
| Defendants. | : | |

**RULING RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 25) &
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 28)**

## I.  INTRODUCTION

The plaintiffs, Leticia Colon de Mejias, the Connecticut Fund for the Environment,

Inc., Fight the Hike, Energy Efficiencies Solutions, LLC, Best Home Performance of

Connecticut, Connecticut Citizen Action Group, New England Smart Energy Group,

LLC, CT Weatherproof Insulation, LLC, Steven C. Osuch, Energy ESC, LLC, Jonathan

Casiano, and Bright Solutions, LLC, (collectively, "plaintiffs"), filed this action against the

Governor, Treasurer, and Comptroller of the State of Connecticut (collectively,

"defendants") in their official capacities.  See generally Complaint ("Compl.") (Doc. No.

1).  The plaintiffs challenge the constitutionality of Connecticut's Public Act 17-2, as

amended by Public Act 18-81 (the "Act").  Id. at ¶ 1.

The Act partially depletes two legislatively created funds: the Energy

Conservation and Load Management Fund (the "C&LM Fund") and the Clean Energy

Fund, both of which are financed by surcharges on the electricity bills of certain

Connecticut electricity users, including all of the plaintiffs in this case.  Local Rule 56(a)1

Stipulated and Agreed Statement of Undisputed Facts ("Stip. Facts") (Doc. No. 26) at ¶¶

3–12, 20, 21, 29, 30, 64–86. Specifically, the Act transfers money from the C&LM Fund and the Clean Energy Fund to the state's general purpose fund (the "General Fund"). Id. at ¶¶ 65–67. The plaintiffs claim that this transfer violates the Contract Clause of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Compl. at ¶¶ 64–80. In addition, they assert various claims under Connecticut state law. Id. at ¶¶ 81–97.

Pending before the court are the parties' Cross-Motions for Summary Judgment. Plaintiffs' Motion for Summary Judgment ("Pls.' Mot.") (Doc. No. 25); Defendants' Motion for Summary Judgment ("Defs.' Mot.") (Doc. No. 28). The plaintiffs seek summary judgment on their federal constitutional claims and their state law claim of promissory estoppel. See Pls.' Mot. at 1. The defendants seek summary judgment on all of the plaintiffs' claims. See Defs.' Mot. at 1.

For the reasons set forth below, the plaintiffs' Motion for Summary Judgment is denied. The defendants' Motion for Summary Judgment is granted as to the plaintiffs' federal constitutional claims, and the court declines to exercise supplemental jurisdiction over the plaintiffs' remaining state law claims.

## II.    BACKGROUND

The parties have stipulated to the following facts. See Stip. Facts at 1.

### A.    Electric Distribution Service in Connecticut

Two types of entities provide electric distribution service in Connecticut: (1) investor-owned electric distribution companies (the "EDCs"), and (2) municipal electric utilities (the "Municipal Utilities"). Stip. Facts at ¶ 17. The EDCs serve approximately 1.5 million residential and business customers in Connecticut, while the Municipal Utilities serve roughly 125,000 customers. Id. at ¶ 18.

Pursuant to section 16-2 of the Connecticut General Statutes, the Public Utilities Regulatory Authority ("PURA") regulates the rates and services of the EDCs, but not those of the Municipal Utilities.  Id. at ¶ 45.  Specifically, each EDC operates pursuant to a tariff that is approved by PURA.  Id. at ¶ 46.  The tariffs set forth the rate schedules, terms of service, rules and regulations of service, and standard template agreements that the EDCs use in operating their electric distribution systems.  Id. at ¶ 47.  The tariffs may be revised, amended, supplemented, or changed by PURA, either upon accepting a filing by the EDCs or upon PURA's direction to the EDCs.  Id. at ¶ 49.  PURA typically approves new tariffs for the EDCs four times each year.  Id.

B.    The Funds

In 1998, the Connecticut General Assembly (the "General Assembly") passed legislation creating the two funds at issue in this case: (1) the Energy Conservation and Load Management Fund (the "C&LM Fund"), which is codified at section 16-245m of the Connecticut General Statutes; and (2) the Clean Energy Fund, which is codified at section 16-245n of the Connecticut General Statutes.  See id. at ¶¶ 19, 22, 29.  Collectively, these two Funds will be referred to as the "Energy Funds."

1.    The C&LM Fund

Section 16-245m governs the creation and disbursement of the C&LM Fund.  Specifically, it directs PURA to assess "a charge of three mills per kilowatt hour of electricity sold to each end use customer of an [EDC]" (the "C&LM Charge").  Conn. Gen. Stat. Ann. § 16-245m(a)(1).  The money collected from this electricity-bill surcharge is deposited in the C&LM Fund, which the EDCs are required to create and hold "separate and apart from all other funds or accounts."  Conn. Gen. Stat. Ann. § 16-245m(b).

3

Section 16-245m mandates that the money in the C&LM Fund be spent on "energy conservation and market transformation initiatives" that have been approved by Connecticut's Commissioner of Energy and Environmental Protection (the "Commissioner"). Conn. Gen. Stat. § 16–245m(b). Specifically, EDCs are directed to submit a Conservation and Load Management Plan (the "Plan") to the Energy Conservation Management Board (the "Board") every three years. Conn. Gen. Stat. § 16–245m(d)(1). The Plan details energy conservation and efficiency programs that will be financed by the C&LM Fund. Conn. Gen. Stat. § 16–245m(d)(5) (providing examples of programs that may be financed by the C&LM Fund). The Board, which is appointed and convened by the Commissioner, advises and assists the EDCs in the development the Plan. Conn. Gen. Stat. § 16–245m(c), (d)(1). Once the Board has approved the Plan, it transmits the Plan to the Commissioner for review. Conn. Gen. Stat. § 16–245m(d)(1). The Commissioner, in turn, "shall . . . approve, modify, or reject said plan[.]" Conn. Gen. Stat. § 16–245m(d)(1). After the Commissioner has approved the Plan, PURA authorizes disbursements from the C&LM Fund to implement the Plan.[1] Conn. Gen. Stat. § 16–245m(b).

If the budget needed to implement the Plan exceeds the revenues collected by the C&LM Charge, PURA must make up the difference by assessing a second charge of no more than three mills per kilowatt of electricity sold to each EDC customer. Conn.

---

[1] Initially, the Department of Public Utility Control was responsible for approving the Plan. See P.A. 98-28, § 33(d) ("The Energy Conservation Management Board shall advise and assist the electric distribution companies in the development and implementation of a comprehensive plan, which plan shall be approved by the Department of Public Utility Control[.]"). In 2011, however, Connecticut restructured its energy and environmental agencies into a single Department of Energy and Environmental Protection. Compl. at ¶ 34. In that same year, the General Assembly passed P.A. 11-80, which made the Commissioner of the Department of Energy and Environmental Protection responsible for approving the Plan. Stip. Facts at ¶ 37

4

Gen. Stat. § 16–245m(d)(1). This second charge is known as the "conservation adjustment mechanism" charge (the "CAM Charge"). Stip. Facts at ¶ 37.

Together, the C&LM Charge and the CAM Charge collect approximately $156 million per year from EDC customers. Stip. Facts at ¶ 39. These monies fund a variety of energy efficiency and renewable energy programs that help EDC customers reduce the cost and amount of energy used in their homes and businesses. Id. at ¶¶ 23, 24. In addition, these programs work to "advance the efficient use of energy, reduce air pollution, reduce negative environmental impacts of greenhouse gas emissions, and promote economic development and energy security across the State." Id. at ¶ 23. The customers of Municipal Utilities are not entitled to use these programs, because those customers do not contribute to the C&LM Fund. Id. at ¶¶ 27, 28. Instead, Municipal Utilities are required by a separate law to implement their own conservation and load management programs, which are funded by a separate charge assessed on Municipal Utility customers. See Id. at ¶ 36.

## 2. The Clean Energy Fund

Section 16-245n governs the creation and administration of the Clean Energy Fund. It requires PURA to assess a charge of not less than one mill per kilowatt hour of electricity sold to each EDC customer (the "Clean Energy Charge"). Conn. Gen. Stat. § 16-245n(b). The money collected from this electricity-bill surcharge is deposited into the Clean Energy Fund, which is administered by the Connecticut Green Bank (the "Green Bank"). Conn. Gen. Stat. § 16-245n(b), (c).

The Green Bank is a legislatively created financial institution that leverages public and private funds to accelerate the deployment of clean energy technologies in Connecticut. Stip. Facts at ¶ 31; Conn. Gen. Stat. 16-245n(d)(1)(A) (establishing the

Green Bank "as a body politic and corporate, constituting a public instrumentality and political subdivision of the state of Connecticut established and created for the performance of an essential public and governmental function."). Towards that end, Section 16-245n(c) authorizes the Green Bank to use the Clean Energy Fund "to promote investment in clean energy in accordance with a comprehensive plan developed by [the Green Bank][.]" See also Stip. Facts at ¶ 30.

C.    The Act

On October 27, 2017, the Governor signed Public Act 17-2.[2] Stip. Facts at ¶ 64. Section 683 of Public Act 17-2 amended section 16-245m of the Connecticut General Statutes by directing the transfer of $63.5 million each year from the C&LM Fund to Connecticut's General Fund for fiscal years 2018 and 2019.[3] Id. at ¶ 65. Section 685 of Public Act 17-2 also amended section 16-245n of the Connecticut General Statutes by directing the transfer of $14 million each year from the Clean Energy Fund to the General Fund for fiscal years 2018 and 2019. Id. at ¶ 66.

On May 15, 2018, the Governor signed Public Act 18-81, which reduced the amount of money transferred from the C&LM Fund to the General Fund in fiscal year 2019 from $63.5 million to $53.5 million.[4] Id. at ¶ 67. However, Public Act 18-81 left unchanged the $63.5 million transfer from the C&LM Fund for fiscal year 2018 and the

---

[2] Public Act 17-2, An Act Concerning the State Budget for the Biennium Ending June 30, 2019, Making Appropriations Therefore, Authorizing and Adjusting Bonds of the State and Implementing Provision of the Budget.

[3] Connecticut's fiscal year begins on July 1 of a calendar year and ends on June 30 of the following calendar year. Stip. Facts at ¶ 74.

[4] Public Act 18-81, An Act Concerning Revisions to the State Budget for Fiscal Year 2019 and Deficiency Appropriations for Fiscal Year 2018.

$14 million transfer from the Clean Energy Fund for each of fiscal years 2018 and 2019.
Id.

The required transfers for fiscal year 2018 occurred on June 25, 2018. Id. at ¶ 86. On that date, a total of $77.5 million were transferred from the C&LM Fund ($63.5 million) and the Clean Energy Fund to the General Fund ($14 million). Id.; Exhibits 18A & 18B (Doc. No. 26-6). The transfers for fiscal year 2019 are scheduled to occur on June 25, 2019. Stip. Facts at ¶ 74.

## III.    LEGAL STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71–72 (2d Cir. 2016). Once the moving party has met its burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present "such proof as would allow a reasonable juror to return a verdict in [its] favor," Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its

case is so slight,' summary judgment should be granted." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).  On the other hand, where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact.  Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 230 (2d Cir. 2015) (quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)).

## IV.   ANALYSIS

The plaintiffs challenge the lawfulness of the transfers required under Public Act 17-2, as amended by Public Act 18-81, (the "Act").  See Compl. at 2.  In particular, they argue that the Act violates the Contract Clause and the Fourteenth Amendment's Equal Protection Clause of the United States Constitution.  Id. at ¶¶ 64–80.  They also bring various claims under Connecticut state law.  Id. at ¶¶ 81 – 85 (violation of section 16-245n(h) of the Connecticut General Statutes); id. at ¶¶ 86 – 90 (violation of section 12-412(8) of the Connecticut General Statutes;  id. at ¶¶ 91 – 97 (promissory estoppel).

The plaintiffs now seek summary judgment on their Contract Clause claim, their Equal Protection claim, and their state law claim for promissory estoppel.  Pls.' Mot. at 1.  The defendants seek summary judgment on all of the plaintiffs' federal and state law claims.  Defs.' Mot. at 1.  The court addresses each of these claims in turn.

### A.   Contract Clause

The plaintiffs argue that summary judgment is warranted as to their Contract Clause claim because there is no issue of material fact that the Act substantially impairs their contractual relationship with their EDCs.  See Pls.' Mem. at 11.  The defendants argue that the plaintiffs' Contract Clause claim fails as a matter of law because the plaintiffs do not have any contractual rights as to how the Energy Funds are spent.  See

Defs.' Mem. at 1–2. Therefore, the defendants contend, the Act does not violate the Contract Clause because the Act, which only alters how the two Energy Funds are spent, does not impair any contractual obligations owed to the plaintiffs. See id. at 8.

In addressing these arguments, the court will begin by outlining the legal framework for analyzing Contract Clause claims. It will then turn to why, in this case, there is no basis for concluding that the transfer of money from the Energy Funds to the General Fund has impaired any of the plaintiffs' contractual rights.

1.     General Analysis Framework

The Contract Clause of the United States Constitution provides that no state shall pass any law "impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1. "Although the Contract Clause appears literally to proscribe 'any' impairment, . . . 'the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.'" U.S. Tr. Co. of New York v. New Jersey, 431 U.S. 1, 21 (1977) (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934)). Instead, "courts must accommodate the Contract Clause with the inherent police power of the state to safeguard the vital interests of its people." Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367–68 (2d Cir. 2006) (internal quotation marks omitted).

The threshold inquiry in a Contract Clause analysis is whether there exists a contractual obligation that has been impaired by state action. Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (identifying as the first inquiry in a Contract Clause analysis whether there was a contractual relationship that has been impaired by a change in law). The Supreme Court has defined "the obligation of a contract [as] the law which binds the parties to perform their agreement." Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 129 (1991) (internal quotation marks omitted).

Put differently, a contract's obligations are its legally enforceable rights and duties.  See Pineman v. Oechslin, 637 F.2d 601, 604 (2d Cir. 1981) (holding that "only those arrangements enforceable as contractual obligations under state law are protected by the Contract Clause against impairment").  Thus, for example, state action impairs the obligations of a contract when it "convert[s] an agreement enforceable at law into a mere promise, thereby impairing the contract's obligatory force."  Gen. Motors Corp., 503 U.S. at 189.  In contrast, no contractual obligation is impaired when state action implicates the subject matter of a contract, but does not alter any of the duties that the parties to the contract are legally required to perform.  See Nw. Nat. Life Ins. Co. v. Tahoe Reg'l Planning Agency, 632 F.2d 104, 106 (9th Cir. 1980) (holding that a land use ordinance did not impair the plaintiffs' contractual rights because the plaintiffs' contracts did not give them any "guarantee that the lands assessed would be free from restrictive zoning"); Stoneridge Apts., Co. v. Lindsay, 303 F. Supp. 677, 679 (S.D.N.Y. 1969) ("The [Contract Clause] is clearly intended to protect benefits and rights of a party under a contract and not to interfere with legislation which merely relates to the subject matter of the contract.").

In determining whether there exists a contractual obligation for Contract Clause purposes, courts look to both state and federal law.  Pineman, 637 F.2d at 604.  As the Second Circuit has explained, this inquiry is a question of state law because "only those arrangements enforceable as contractual obligations under state law are protected by the Contract Clause against impairment."  Id.  However, "[f]ederal courts must have the ultimate authority to determine, as a matter of constitutional law, whether a particular arrangement, of the sort normally enforceable as a contract under state law, is a

contract protected by the Contract Clause; otherwise, states could always evade the restraint of the Clause by determining, through legislation or adjudication, that an arrangement previously regarded as a contract was no longer enforceable." Id. Thus, while federal courts "accord respectful consideration and great weight to the views of the State's highest court, . . . [t]he question of whether a contract was made is ultimately a federal question for purposes of Contract Clause analysis, and whether it turns on issues of general or purely local law, [federal courts] cannot surrender the duty to exercise [their] own judgment." Gen. Motors Corp., 503 U.S. at 187 (internal quotation marks and citations omitted).

If there exists a contractual arrangement that has been impaired by state action, courts in this Circuit then engage in a three-part analysis to determine whether the state law's impairment of the contract violates the Contract Clause. See Buffalo Teachers, 464 F.3d at 368. First, the court must ask whether "the contractual impairment [is] substantial." Id. If so, the court should then inquire whether "the law serve[s] a legitimate public purpose such as remedying a general social or economic problem." Id. Finally, if such purpose is demonstrated, the court must ask whether "the means chosen to accomplish this purpose [are] reasonable and necessary." Id.

In this case, the court need not take up this three-part analysis. As explained below, there is no basis to conclude that the Act impairs any contractual relationship between the plaintiffs and the EDCs.

2.      Existence of a Contract in this Case

The plaintiffs argue that the contract at issue in this case is for the provision of electric service by the EDCs to the plaintiffs. See Pls.' Mem. at 13. The terms of this contract are set forth in the EDCs' tariffs. See id. Both parties agree these tariffs create

contracts between the EDCs and their customers.  See id.; Defs.' Opp'n at 2.  The

plaintiffs argue that these contracts, in turn, create an array of legal rights and

obligations relating to the C&LM Fund and the Clean Energy Fund, namely: (1) the right

of EDC customers to access the conservation programs funded by the Energy Funds,

see Pls.' Mem. at 16; (2) the obligation that the EDCs deposit money raised by the

C&LM, CAM, and Clean Energy Fund Charges into the Energy Funds, see id. at 15;

and (3) the right of EDC customers to have the money that is deposited in the Energy

Funds spent on conservation and clean energy programs in accordance with sections

16-245m and 16-245n, see id. at 17.

However, as the plaintiffs appear to recognize,[5] only the last of these contractual

rights would provide a basis for the plaintiffs' claim that the Act violates the Contract

Clause.  As noted above, the Act transfers money from the C&LM Fund and the Clean

Energy Fund, where that money would be spent on conservation and clean energy

programs, to the General Fund, where that money will be spent on other state priorities.

See, supra, at 6–7.  Beyond these money transfers, the Act does not alter any other

---

[5] Although the plaintiffs argue that the EDCs' tariffs give them various contractual rights relating to the Energy Funds, they appear to rest their Contract Clause claim on the Act's alleged impairment of their rights to have the money in the Energy Funds spent on conservation and clean energy programs.  See Pls.' Mem. at 17.  In particular, the plaintiffs argue:

> In summary, the undisputed record reflects that the [transfers] gut the fundamental understanding between the Plaintiffs and the Utilities regarding the payment of surcharges to the C&LM Fund and [Clean Energy Fund]. As a result of the [transfers], Plaintiffs—in essence—no longer get what they paid for. While the Plaintiffs will continue to pay surcharges to fund the C&LM Fund and [Clean Energy Fund], the Plaintiffs will no longer receive the benefits of their payments. Or they will receive a fraction of the benefits to which they were previously entitled. Accordingly, this Court should find that P.A. 17-2, as modified by P.A. 18-81, §12, operates as a substantial, if not total impairment, of the relevant contractual relationships.

Id.

parameters of the two Funds.  The Act does not, for example, change the rates at which money is collected under the C&LM, CAM, and Clean Energy Fund Charges; alter the requirements that the EDCs deposit the money collected under these Charges into the Energy Funds; or limit customers' entitlement to participate in their EDCs' conservation and clean energy programs.  Thus, "the precise contractual right" at issue in this suit is the right to prevent or limit the transfer of money from the Energy Funds to the General Fund.  Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 504 (1987) ("In assessing the validity of petitioners' Contracts Clause claim in this case, we begin by identifying the precise contractual right that has been impaired and the nature of the statutory impairment.").  Put differently, the threshold question in this case is whether the plaintiffs' contracts with their EDCs expressly or implicitly given them contractual rights over how the money in the two Energy Funds is spent.  See RUI One Corp. v. City of Berkeley, 371 F.3d 1137, 1147 (9th Cir. 2004) (emphasizing that the threshold inquiry in a Contract Clause analysis is "not whether any contractual relationship whatsoever exists between the parties, but whether there was a 'contractual agreement regarding the specific terms allegedly at issue'") (quoting Gen. Motors Corp., 503 U.S. at 186–87) (internal quotation marks and alterations omitted).

As the plaintiffs acknowledged at oral argument, their contracts with the EDCs do not expressly prevent the transfer of money out of the Energy Funds.  See Transcript, September 13, 2018, Oral Argument ("Tr.") (Doc. No. 34) at 6:7–9 ("We agree with the defendants that there's no explicit language in the tariffs that says they are limited to how they spend the money.").  While EDCs' tariffs specify the rates at which EDCs must collect money from customers under the C&LM, CAM, and Clean Energy Charges,

none of these documents contain terms or conditions that limit how this money should be spent after it has been deposited in the Energy Funds.  See generally Exhibits 1, 3, 5, 6, 7 (Doc. Nos. 26-1, 26-3, 26-5, 26-6, 26-7) (tariff documents in record).  Indeed, in reviewing the tariffs in the record, the court identified only one instance in which a tariff even mentioned how the money raised by the Charges would be used.  See Exhibit 7 at 15.  That tariff merely noted that the C&LM Charge "is the charge to fund programs that promote energy conservation and efficiency," and that the Clean Energy Charge "fund[s] programs that promote the use of renewable (or environmentally friendly) fuel sources, such as solar power, wind, fuel cells, methane gas from landfills, biomass, trash-to-energy, and water."  Id.  Such language, which is purely descriptive in nature, does not create any contractual obligation flowing to the plaintiffs from the EDCs.[6] Accordingly, there is no basis for concluding that the Act impairs any legal rights or obligations that are expressly set forth in the plaintiffs' contracts with their EDCs.

The plaintiffs, however, argue that the Act substantially disrupts the "implicit understanding" that the money collected from the ratepayers and deposited into the Energy Funds would be used to support conservation and clean energy programs.  Tr. at 6:22–7:3.  Although not entirely clear from their written briefs, the plaintiffs' argument here appears to be that the EDCs' tariffs contain an implied contractual obligation that prevents money transfers from the two Energy Funds.  See Pls.' Mem. at 21 (arguing that the parties expectations that the Energy Funds will be used to support conservation

---

[6] Indeed, as discussed below, the EDCs do not have the authority to control how the money in the Energy Funds is spent.  See, infra, at 16–18.  Instead, sections 16-245m and 16-245n of the Connecticut General Statutes give the Commissioner and the Green Bank final authority over how the Energy Funds are used.  See id.

and clean energy programs are "assured by the implied contract of the filed tariffs").  At oral argument, for example, the plaintiffs claimed that the EDCs' tariffs incorporated the "body of law" relating to these two Energy Funds, including (1) sections 16-245m and 16-25n of the Connecticut General Statutes, and (2) the filed rate doctrine.  See Tr. at 9:10–10:13.  They argued that this body of law, which was "baked into the language of the tariff[s][,]" created "a regulatory understanding" that the money deposited in the Energy Funds would be spent according to sections 16-245m and 16-245n.  Id. at 6:22–7:6.

It is a well-established principle that "the laws which subsist at the time and place of the making of a contract enter into and form a part of it[.]"  Gen. Motors Corp., 503 U.S. at 188 (quoting Blaisdell, 290 U.S. at 429–430) (internal quotation marks and alterations omitted).  Courts will therefore incorporate state laws into private contracts, regardless of the assent of the parties, when "those laws affect the validity, construction, and enforcement of [the] contracts."  Id.  These incorporated laws, in turn, may create implied contractual obligations that, while not expressly stated in a contract, may nonetheless provide a basis for a Contract Clause claim.  See id. at 188–89 (concluding that Michigan law at the time the contract in question was formed did not give employers certain implied contractual rights relating to workers' compensation).

In this case, however, the plaintiffs do not have an implied contractual right over how the money in Energy Funds is spent.  As explained below, section 16-245m, section 16-245n, and the filed rate doctrine may have created the expectation among EDC customers that the Energy Funds would be spent on conservation and clean

energy programs.  They did not, however, give the plaintiffs any right to legally enforce those expectations.

a. <u>Sections 16-245m and 16-245n</u>

Statutes may create contractual obligations between the government and private parties that are protected by the Contract Clause from impairment by state action.  <u>See U.S. Tr. Co. of New York v. New Jersey</u>, 431 U.S. 1, 18 n.14 (1977) ("In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State.").  However, "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise."  <u>Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.</u>, 470 U.S. 451, 465–66 (1985) (internal quotation marks omitted). When determining whether the legislature intended a statute to give rise to contractual obligations, courts look to the language of the statute.  <u>See id.</u> at 466 ("In determining whether a particular statute gives rise to a contractual obligation, it is of first importance to examine the language of the statute.") (internal quotation marks omitted); <u>Indiana ex rel. Anderson v. Brand</u>, 303 U.S. 95, 104 (1938) ("Where the claim is that the state's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract.").  Courts "generally find[ ] such legislative intent only where the language of the statute itself uses contractual terminology."  <u>W. 95 Hous. Corp. v. New York City Dep't of Hous. Pres. & Dev.</u>, 31 F. App'x 19, 20–21 (2d Cir. 2002) (collecting cases).

In this case, there is no language in sections 16-245m or 16-245n that suggests that the State of Connecticut entered into a contractual arrangement with the plaintiffs regarding how the Energy Funds would be used. Indeed, these provisions make clear that state government entities have full discretion over the use and disbursement of these Funds, not Connecticut ratepayers or the EDCs. Section 16-245m(d)(1), for example, gives the Commissioner final authority to "approve, modify, or reject" any Plan for spending money in the C&LM Fund. Likewise, disbursements from the Clean Energy Fund may only be made "[u]pon the authorization of the Connecticut Green Bank" and "in accordance with a comprehensive plan developed by [the Green Bank] to foster the growth, development and commercialization of clean energy sources[.]" Conn. Gen. Stat. 16-245n(c). Nor is there any language in these statutes suggesting that the Legislature had promised to not subsequently amend these statutory provisions in the future. See Parella v. Ret. Bd. of Rhode Island Employees' Ret. Sys., 173 F.3d 46, 60 (1st Cir. 1999) ("A statutory provision can also evince an unmistakable intent to contract if it expressly bars future amendments that would reduce benefits already granted."). Accordingly, there is no basis in the language of these statutes for concluding that the plaintiffs have a contractual right in how the money in the Energy Funds are used.

To be clear, sections 16-245m and 16-245n do impose limitations on how the C&LM Fund and the Clean Energy Fund may be used. For example, section 16-245m requires that money in the C&LM Fund be spent on "cost-effective energy conservation programs and market transformation initiatives." Conn. Gen. Stat. 16-245m(d)(1). Likewise, section 16-245n requires that the Clean Energy Fund be "used for

expenditures that promote investment in clean energy[.]" Conn. Gen. Stat. 16-245n(c).

However, those limitations do not create binding contractual obligations that flow from

the State to the plaintiffs. Instead, they "merely declare[ ] a policy to be pursued until

the legislature shall ordain otherwise." Nat'l R.R. Passenger Corp., 470 U.S. at 465–66.

As such, these statutes do not provide a basis for the plaintiffs' Contract Clause claim.

b.    Filed Rate Doctrine

The plaintiffs argue that the filed rate doctrine creates the expectation that the

terms and conditions of the EDCs' tariffs will remain in effect until PURA approves a

new set of tariffs. See Pls.' Mem. at 20–21. They argue that the Act impaired this

expectation by partially depleting the Energy Funds without first modifying the EDCs'

tariffs. See id. at 21.

The filed rate doctrine forbids a regulated entity from charging rates for its

services other than those filed with the appropriate regulatory agency.[7] See Arkansas

Louisiana Gas Co. v. Hall, 453 U.S. 571, 573 (1981) (holding that "the filed rate doctrine

prohibits a federally regulated seller of natural gas from charging rates higher than

those filed with the Federal Energy Regulatory Commission"). Once a tariff rate has

been approved by the regulator, that rate is deemed to be the sole lawful rate that may

be charged. See Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 127

---

[7] Connecticut has codified the filed rate doctrine in section 16-19(a) of the Connecticut General
Statutes, which provides in relevant part:

No public service company may charge rates in excess of those previously approved by
the Public Utilities Control Authority or the Public Utilities Regulatory Authority, except that
any rate approved by the Public Utilities Commission, the Public Utilities Control Authority
or the Public Utilities Regulatory Authority shall be permitted until amended by the Public
Utilities Regulatory Authority . . . .

(1990) ("[T]he rate of the carrier duly filed is the <u>only</u> lawful charge.") (quoting <u>Louisville & Nashville R. Co. v. Maxwell</u>, 237 U.S. 94, 97 (1915)) (emphasis added). Because the filed rate is the one and only lawful rate, the filed rate doctrine simultaneously bars ratepayers from challenging the rates approved by the regulator, <u>see</u> <u>Wegoland Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 18 (2d Cir. 1994), and prohibits utilities from deviating from the approved rates, <u>see</u> <u>Maislin Indus.</u>, 497 U.S. at 127.

In short, courts use the filed rate doctrine to, <u>inter alia</u>, "ensure that carriers and customers comply with the terms of their tariff agreements[.]" <u>Commc'ns Network Int'l, Ltd. v. MCI WorldCom Commc'ns, Inc.</u>, No. 08-CV-7254 GBD, 2010 WL 3959601, at *4 (S.D.N.Y. Sept. 14, 2010). The doctrine has been "extended across the spectrum of regulated utilities." <u>Simon v. KeySpan Corp.</u>, 694 F.3d 196, 205 (2d Cir. 2012) (internal quotation marks omitted). It has been applied "not only to rates or charges, but also to non-price aspects of [ ] services[.]" <u>Glob. NAPS, Inc. v. Verizon New England, Inc.</u>, 327 F. Supp. 2d 290, 301 (D. Vt. 2004), <u>aff'd</u>, 454 F.3d 91 (2d Cir. 2006).

In this case, the plaintiffs' invocation of the filed rate doctrine is perplexing. The plaintiffs argue that the filed rate doctrine creates the expectation that the terms and conditions contained in the EDCs' tariffs will not change until those tariffs are superseded by new tariffs that have been duly authorized by PURA. <u>See</u> Pls.' Mem. at 20–21. They further argue that the Act impaired those expectations by transferring money out of the Energy Funds without first amending the terms of the EDCs' tariffs. <u>See</u> <u>id.</u> at 21. However, as discussed above, and as the plaintiffs themselves acknowledged at oral argument, <u>see</u>, <u>supra</u>, at 13, the express terms of the EDCs' tariffs do not include any contractual obligation limiting the use of money that has been

deposited into the Energy Funds.  Therefore, the Act does not implicate the filed rate doctrine because it does not alter any terms of the EDCs' tariffs.

In sum, there is no basis for concluding that the Act impaired any express or implied contractual right given to the plaintiffs by their contracts with the EDCs.  As the existence of an impaired contractual obligation is a pre-requisite to a Contract Clause violation, summary judgment is warranted in the defendants' favor on the plaintiffs' Contract Clause claim.

B.    Equal Protection

Both parties also move for summary judgment on the plaintiffs' claim that the Act violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution by assessing a tax on EDC customers that has no rational relation to a legitimate governmental purpose.  See Pls.' Mot. at 1; Defs. Mot. at 1; Pls.' Mem. at 31–32.  Specifically, the plaintiffs argue that the Act operates as a tax by shifting money from the Energy Funds to the General Fund.  See Pls.' Mem. at 32.  Because only EDC customers contribute to the Energy Funds, the plaintiffs argue that the Act assesses a tax on EDC customers, but not Municipal customers.  See id. at 33.  The plaintiffs argue that this decision to tax EDC customers, but not Municipal customers, does not rationally further any legitimate state interest and, thus, violates the Equal Protection Clause.  See id.

The defendants argue, inter alia, that summary judgment is warranted in their favor because the Act does not operate as a tax.  Instead, they argue, it simply codifies a governmental decision about how to spend tax revenue that has already been collected.  See Defs.' Mem. at 19–20.  The defendants contend that summary judgment

in their favor is appropriate because the plaintiffs do not have standing to challenge the Act under the taxpayer standing doctrine. See id.

The court addresses these arguments in two parts. First, it addresses whether, as a matter of law, the Act is a tax. It then addresses the question of taxpayer standing.

1.    Is the Act a Tax?

At its most basic level, a tax involves the transfer of property from citizens to their government. Black's Law Dictionary, for example, defines a tax as "[a] charge, [usually] monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue." Tax, Black's Law Dictionary (10th ed. 2014). The Second Circuit has similarly defined a tax as "an impost levied by authority of the government upon its citizens or subjects for the support of the state." Nolte v. Hudson Nav. Co., 8 F.2d 859, 862 (2d Cir. 1925). Although the nature of the tax may vary by statute and context, the transfer of property from citizens to the government remains a core feature of many, if not all, recognized taxation schemes. See, e.g., Heiner v. Donnan, 285 U.S. 312, 327 (1932) (in a case involving a death transfer tax, defining taxation as "[t]hat . . . which compels one to pay for the support of the government from his own gains and of his own property."); United States v. Baltimore & O.R. Co., 84 U.S. 322, 326 (1872) (same definition in a case involving taxation of a corporation); Entergy Nuclear Vermont Yankee, LLC v. Shumlin, No. 5:12-CV-206, 2012 WL 5285390, at *6 (D. Vt. Oct. 25, 2012) ("Courts, including the Second Circuit, have broadly defined the word 'tax' under the [Tax Injunction Act] to include any state or local revenue collection device.") (emphasis added), aff'd, 737 F.3d 228 (2d Cir. 2013).

In this case, the question of whether the Act operates as a tax turns on whether the plaintiffs have any property interests in the Energy Funds. The Act does not raise

revenue directly from EDC customers, but instead reallocates money that has already been collected from these customers and placed in the Energy Funds.  See, supra, at 6–7.  Thus, if the plaintiffs do not have property interests in the money held in the Energy Funds, the Act does not, as a matter of law, operate as a tax because it does not transfer property from the plaintiffs to the State.  See Nolte, 8 F.2d at 862 ("A tax is a portion of the property of the citizen required by the government for its support in the discharge of its various functions and duties[.]") (quoting Graham v. Twp. of St. Joseph, 67 Mich. 652, 655 (1888)) (internal quotation marks omitted).

The existence of a property interest is a question of state law.  See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972) ("Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); Presnick v. Berger, 837 F. Supp. 475, 479 (D. Conn. 1993) ("The existence of a property interest is necessarily a question of state law.").  The Connecticut Supreme Court has held that, "[t]o have a property interest[,] a person clearly must have more than an abstract need or desire for it . . . [and] more than a unilateral expectation of it." Chatterjee v. Comm'r, 277 Conn. 681, 695 (2006) (quoting Giaimo v. New Haven, 257 Conn. 481, 499 (2001)).  The person "must, instead, have a legitimate claim of entitlement to it."  Id.; see also A. Gallo & Co. v. Comm'r, 309 Conn. 810, 839 (2013) (concluding that there was no unconstitutional taking because "the plaintiffs failed to prove that they had a clear entitlement" to the property at issue).  In determining whether parties have a property interest, the Connecticut Supreme Court looks to

several "incidents of ownership," including: "(1) the right to use the property; (2) the right to earn income from the property and to contract over its terms with other individuals; and (3) the right to dispose of, or transfer, ownership rights permanently to another party." See A. Gallo, 309 Conn. at 838 (internal citations omitted).

Here, the plaintiffs have no recognizable property interest in the money that has been deposited in the Energy Funds. As discussed above, sections 16-245m and 16-245n clearly provide that the money in the Energy Funds is entirely under the control of governmental entities, not the plaintiffs. See, supra, at 16–17. Thus, the plaintiffs have no legal right to withdraw, transfer, or otherwise control the use of the money held in the Energy Funds. At most, they have a "unilateral expectation" that the money in the Energy Funds will be spent on conservation and clean energy programs that will benefit them. Chatterjee, 277 Conn. at 695. Such expectations, however, fall short of "a clear entitlement" to the money in the Energy Funds. A. Gallo, 309 Conn. at 839; see also id. at 838–839 (concluding that the plaintiffs had no property interest because their right to use and control the property at issue was "severely limited" by the passage of a 2008 statute).

Thus, the Act does not assess a tax on the plaintiffs because it does not appropriate money from the plaintiffs. Instead, it merely transfers revenue – that the government has previously collected from ratepayers – from one set of funds to another. Accordingly, the plaintiffs' Equal Protection claim simply challenges the State's decision to transfer government revenue from the Energy Funds (which benefit the plaintiffs) to the General Fund (which may benefit the plaintiffs less directly).

2.      Taxpayer Standing

The taxpayer standing doctrine prevents the plaintiffs from challenging the State's decision to allocate revenue between the Energy Funds and the General Fund. This doctrine holds that, absent a narrow set of circumstances, taxpayers do not have standing to challenge how state or federal governments spend tax revenue.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 345 (2006) (extending taxpayer standing doctrine to state taxpayers); In re U.S. Catholic Conference (USCC), 885 F.2d 1020, 1027 (2d Cir. 1989) ("The basic rule is that taxpayers do not have standing to challenge how the federal government spends tax revenue.").  In justifying this rule, the Supreme Court has stressed that "the decision of how to allocate [government budgets] is the very epitome of a policy judgment committed to the broad and legitimate discretion of lawmakers, which the courts cannot presume either to control or to predict." DaimlerChrysler, 547 U.S. at 345 (internal quotation marks omitted).  Thus, "because state budgets frequently contain an array of tax and spending provisions, any number of which may be challenged on a variety of bases, affording state taxpayers standing to press such challenges simply because their tax burden gives them an interest in the state treasury would interpose the federal courts as virtually continuing monitors of the wisdom and soundness of state fiscal administration, contrary to the more modest role Article III envisions for federal courts."  Id. at 346 (internal quotation marks omitted).

Accordingly, the Supreme Court has carved out only a narrow exception to the general prohibition on taxpayer standing.  Specifically, in Flast v. Cohen, the court held that taxpayers have standing to challenge expenditures that violate the Establishment Clause when such allegedly unconstitutional spending was authorized by Congress

under the taxing and spending clause of section 8 of Article I of the United States Constitution.  See 392 U.S. 83, 103 (1968); In re U.S. Catholic Conference, 885 F.2d at 1027.  While the Flast court suggested that other constitutional provisions might provide a basis for taxpayer suits, the Supreme Court has yet to extend the Flast exception beyond Establishment Clause claims.  See DaimlerChrysler, 547 U.S. at 347; Fischer v. Cruz, No. 16-CV-1224(JS)(ARL), 2016 WL 1383493, at *3 (E.D.N.Y. Apr. 7, 2016) (collecting cases).

The principles animating the taxpayer standing doctrine apply with equal force to this case, notwithstanding the plaintiffs' contention that the C&LM, CAM, and Clean Energy Charges assessed against them do not qualify as a tax.  See Pl.'s Opp'n at 17–18.  Like the plaintiffs in other taxpayer suits, the plaintiffs here seek to challenge how the government spends money that it has collected from the plaintiffs.  Regardless of whether the court classifies the Charges as a tax, a regulatory fee, or some other form of government imposed financial obligation, the plaintiffs' suit implicates all of the same considerations and concerns underpinning the taxpayer standing doctrine.  Moreover, the plaintiffs offer no argument for extending them standing under the Flast exception, and the court sees no reason to do so.  See Tr. at 52:15 (agreeing that the plaintiffs will not have standing if the court concludes that the Act is not a tax).  Thus, as the plaintiffs have no right to insist that the State of Connecticut spends its revenue on programs that benefit them, see DaimlerChrysler, 547 U.S. at 344–45, the plaintiffs lack standing to proceed with their Equal Protection claim.  The court therefore dismisses the plaintiffs' Equal Protection claim for lack of jurisdiction.

C.    State Law Claims

Having dismissed all of the plaintiffs' federal law claims, the court declines to exercise its supplemental jurisdiction over the plaintiffs' state law claims.  Where "the district court has dismissed all claims over which it has original jurisdiction," it may decline to exercise supplemental jurisdiction over any remaining causes of action.  28 U.S.C. § 1367(c)(3).  Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  DiLaura v. Power Auth. of State of N.Y., 982 F.2d 73, 80 (2d Cir. 1992) (quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)); see also Artis v. D.C., 138 S. Ct. 594, 597–98 (2018) ("When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims.").  The plaintiffs have not identified any countervailing factors that would justify the exercise of supplemental jurisdiction, and none are readily apparent to the court.  Given that the plaintiffs' constitutional claims provided the sole basis for federal jurisdiction, the court dismisses the plaintiffs' remaining state law claims without prejudice.

## V.    CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Summary Judgment (Doc. No. 25) is denied.  The defendants' Motion for Summary Judgment (Doc. No. 28) is granted.  The plaintiffs' federal law claims are dismissed with prejudice, and their state law claims are dismissed without prejudice.  The Clerk is directed to close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of October, 2018.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge